Mildred Van Cleve v. Commissioner.
Van Cleve v. Commissioner
Docket No. 4674-67.
United States Tax Court
T.C. Memo 1968-241; 1968 Tax Ct. Memo LEXIS 56; 27 T.C.M. (CCH) 1213; T.C.M. (RIA) 68241; October 21, 1968. Filed *56 Richard C. Robbins, 837 Van Nuys Bldg., 210 W. 7th St., Los Angeles, Calif., for the petitioner. Erwin L. Stuller, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in petitioner's income tax for the calendar year 1964 in the amount of $288.94. The issue for decision is whether petitioner during the calendar year 1964 was engaged in the trade or business of operating a dog kennel so as to be entitled to a deduction for expenses or losses of that operation and, if so, the amount of the expenses or losses she is entitled to deduct. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner, a married woman who resided at Baldwin Park, California, at the time of the filing of the petition in this case, filed her individual Federal income tax return for 1964 with the district director of internal revenue at Los Angeles, California. Petitioner's income tax return was prepared on the cash basis of accounting. During the entire year 1964 petitioner was employed on a full-time basis by the Defense Contract Audit Agency as a contract audit clerk. She is familiar with bookkeeping procedures. *57 On her Federal income tax return for the calendar year 1964 petitioner reported income from wages and salaries of $5,640 and other income (loss) of $1,331.76), resulting in total adjusted income of $4,308.24. Under the section of her income tax return marked "Filing Status" petitioner checked the box opposite the statement "Married filing separate." However, the blank following the statement "If your husband or wife is also filing a return give his or her first name and social security number" was not filled in on petitioner's 1964 income tax return. Petitioner claimed a personal exemption on that return for herself only. One of the deductions claimed by petitioner on her 1964 income tax return was $10 under the designation "CPA fee." Petitioner attached to her 1964 income tax return a Schedule C, Profit (or Loss) from Business or Profession, which listed as the principal business activity "Kennel", showed no gross receipts and reported the following expenses: Rent on business property
$ 210.00
Vet bills and medicine
38.26
Food
453.74
Supplies
73.65
Dog show expenses
52.68
Dues and subscriptions
20.00
Training classes
15.00
Business car expense - "Computed on the basis of 4684.3 miles traveled in connection with operation of Kennels @ 10 per mile" 468.43
$1,331.76
Petitioner *58 has been interested in and owned dogs as pets during most of her life. Prior to 1963 petitioner owned as pets the following dogs: Breed and sex
Name [1]
Date of birth
Date acquired by petitioner
Toy poodle - M
Ko-Ko
January 1960
November 1960
Toy poodle - F
Gigi
June 1960
August 1962
German shepherd - M
Prince
February 1962
August 1962
About the time that petitioner acquired Prince, she began to meet and talk with persons who were interested in showing dogs. She discussed the profit potential of breeding and raising dogs with several of the persons she met who raised show dogs. These persons told her that the best possibility of a person's making a profit was to breed and own a good stud dog which could be shown and could win and establish a reputation for the kennel. Petitioner concluded that there was a profit potential in a dog kennel. She was of the opinion that breeding a female dog and selling the puppies would not be a profitable operation but that expenses of a kennel might be partially defrayed from sales of puppies. Petitioner hoped to acquire a good stud dog that *59 she could use for service, one that would win and which she hoped would eventually become a champion. Neither male dog owned by petitioner during 1963 and 1964 was of stud quality which petitioner considered to be the quality necessary to a profitable operation. Petitioner was of the opinion that in order to have made a profit from her kennel during 1963 and 1964 it would have been necessary that she buy a good stud dog. Prince had a fine pedigree and was of champion stock. He could not be shown, however, because a part of his left ear was missing, as a result of a kennel accident when he was a puppy. Furthermore, petitioner was not free to sell his stud services. Petitioner had acquired Prince from his original owners without cost because they were looking for a good home for him. As part of the transaction petitioner and the seller entered into the following agreement: It is understood between the parties signed below, that Dolthom Kennels will have complete breeding rights on the German Shepherd male - Dolthom's Port of Prince. Should this dog be either resold or given away for any reason, the same understandment [sic] must still apply. Petitioner was of the opinion that this agreement *60 did not prohibit her from breeding Prince with a dog of her own. Ko-Ko, for whom petitioner had paid $80 was not show or stud quality. Ko-Ko was brown. If he was bred with the right mate, Ko-Ko could sire silver puppies. However, in order to assure favorable results, it was necessary to know the genealogy of the mate for three or four generations and this made selection of a mate very difficult. Unless Ko-Ko was bred to a female of the precisely required genealogy, the offspring would be tri-colored or black and white. Such puppies are sometimes referred to as being of "party colors." Only solid colored poodles may be shown in dog shows sponsored by the American Kennel Association. Petitioner never advertised Ko-Ko for stud services or sold his services as a stud. Petitioner decided in 1963 that she would breed her poodles, Ko-Ko and Gigi, sell the puppies whelped and from the proceeds of the sales buy a good German shepherd bitch to breed with Prince. She chose the name Star Pine Kennels for her operation. Petitioner bred Ko-Ko and Gigi twice in 1963. On both occasions five puppies were whelped. Petitioner sold all the puppies at prices ranging from $25 to $40 each. In late 1963, *61 petitioner selected for purchase a newborn female German shepherd, and she took possession of the dog in early February, 1964. Petitioner paid $50 for this dog. The dog was named Stormy Acres Klasse and was called Klasse. Klasse's sire was Prince and petitioner acquired Klasse from the same persons who had given Prince to her. In 1964 petitioner was living in a house which she rented for $70 a month. She kept her dogs on the premises of this rented house. Petitioner intended to continue to breed Ko-Ko and Gigi during the year 1964. However, in the Spring of 1964 petitioner discovered that Gigi had a hernia and could not be successfully bred. In December 1964, Gigi bore one pup, which petitioner either sold or gave away in 1965. Petitioner was fond of Gigi and kept her as a pet in 1964 and subsequent years after it had become apparent that Gigi could no longer 1215 be bred. In a letter which petitioner wrote to respondent in 1965, she stated that the deduction she claimed as business expenses included some expenses attributable to Gigi in 1964, but that such part of her expenses should not have been claimed as business expenses. Klasse was too young to be bred during 1964. During *62 1964 petitioner trained Klasse for show. During this year petitioner spent an average of 10 to 15 hours a week on her kennel activities. Much of the time spent by petitioner in connection with her dogs was on weekends when she shopped for supplies and went to dog shows. Petitioner maintained a record of her supply purchases. This record shows the following purchases and other information for the month of May 1964: Date
Description
Store [1] Miles at 10 permi.[sic.]
Amount [2] *69 w/o S.T.
1
Dog meat
Famous A 32.8
6.75
2
Dog food
Food Giant C 13.2
.35
2
Dog food
Food Giant EM 10.2
7.40
2
Dog vitamins
Pet & Jungle Ar. 16.6
1.95
2
Dog Kibble
Breeders Choice 9.2
3.25
16
Dog eggs
Safeway EM 10.0
2.10
Water gun for training
Woolworth EM 0.0
.39
16
Dog vitamins
Pet & Jungle Ar. 16.6
1.35
16
Saddle soap for leashes
Western Leather S.G. 21.0
.40
16
Dog food
Food Giant EM 10.2
5.68
16
Dog meat
Famous A 32.8
7.05
30
Dog eggs
Eska WC 5.6
1.98
30
Dog food
Food Giant EM 10.2
6.76
30
Dog vitamins
Pet Super Mkt. EM 12.0
1.94
30
Dog meat
Famous A 32.8
4.50
The stores at which petitioner purchased the food and supplies are grocery stores *63 of the same type at which petitioner purchased groceries and household supplies for herself. The records of petitioner's purchases for the month of May 1964 are substantially the same as the records for other months of the year 1964 except as to the precise amounts of purchases and specific stores at which the purchases were made. Petitioner generally also did the shopping for her home on the weekends. Petitioner's records also show that she attended 16 dog shows during the year 1964, but that she entered a dog in only one. The show in which petitioner entered a dog was a "puppy match" held on June 7, 1964, in which she entered Klasse. During 1964 petitioner attended an 11-session dog-training course, subscribed to one "dog magazine," attended several meetings of the German Shepherd Dog Club of Los Angeles City and the Golden West German Shepherd Dog Club, and attended one meeting of the Valley Hills Obedience Club. Petitioner maintained the American Kennel Club registration papers for her dogs, a full pedigree for Prince, and an individual history for each of her dogs. In 1965 Ko-Ko died and petitioner disposed of Prince because he had a bad temperament. She continued to maintain *64 Gigi as a pet. On July 30, 1965, petitioner had Klasse bred to a champion stud owned by another person and paid a stud fee of $150 for the service to the owner of the stud. On September 27, 1965, Klasse's litter was whelped. The record of the litter showed that it consisted of six males and four females. This record also showed sales of four males and three females from the litter in November and December 1965 and the sale of one male and one female from the litter in January 1966. During the year 1966 petitioner purchased property which she considered desirable for building up a kennel. She was planning to breed Klasse again in 1966 but because she was busy getting settled in her new home during that year, did not breed her in that year. Petitioner's record on Klasse shows that the second time Klasse was bred was on March 23, 1968. At the time of trial of this case in May 1968, petitioner had a male dog which she had been showing with some success. At the date of the trial of this case petitioner did not consider this male dog to be fully matured and petitioner could not predict when he would be fully matured. She had not advertised her male dog for stud services at the date of the *65 trial but hoped to so advertise him before the end of the year. 1216 Petitioner had income from and claimed expenses for her kennel operations, as follows in the calendar years indicated: Year
Income
Expenses
1963
$336.00
$1,031.24
1964
0.00
1,331.76
1965
435.00
1,477.77
1966
130.00
990.71 All income was from the sale of puppies. The $130 received in 1966 was for part of the German shepherd litter born in 1965. Respondent determined the deficiency in petitioner's income tax set forth in his notice of deficiency by disallowing the deduction claimed by petitioner for the year 1964 for the loss from operating her kennel in that year. Opinion Section 162, I.R.C. 1954 provides for the deduction of expenses incurred in the operation of a trade or business and section 165, I.R.C. 1954 provides that an individual taxpayer may deduct losses incurred in a trade or business or in a transaction entered into for profit. Petitioner recognizes that in order to be entitled to deduct her expenses, or her loss, [1] incurred in 1964 in the operation of her kennel, she must prove that her kennel operation in 1964 was a trade or business or a transaction entered into for profit and not simply a continuation of her *66 lifelong hobby of keeping dogs as pets. The mere fact that an activity is pleasurable to an individual and is a hobby for other persons, does not mean that such activity cannot be a business for a particular taxpayer. However, in order for an activity to be considered as a trade or business or as a transaction entered into for profit or for the production of income by a taxpayer, such taxpayer must establish that he carried on the activity with an intent to make a profit. This profit motive need not be reasonable in an objective sense, but it must in fact be *67 a bona fide expectation in the operation of the taxpayer in order for the expenses of or losses from that operation to be deductible. Margit Sigray Bessenyey, 45 T.C. 261 (1965), aff'd 379 F. 2d 252 (C.A. 2, 1967), certiorari denied 389 U.S. 931. Whether the taxpayer actually possesses the required profit motive is a question of fact to be decided from a consideration of all the evidence in the particular case. Pync v. United States, 313 U.S. 127 (1941); Hirsch v. Commissioner, 315 F. 2d 731 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court; and Margit Sigray Bessenyey, supra. The conclusion that a profit motive is lacking is not required because losses have been sustained for a period of years, but this fact is to be considered along with other factors. Hirsch v. Commissioner, supra, and Margit Sigray Bessenyey, supra. Respondent argues that petitioner did not have a profit motive in the operation of her kennel during the year 1964 and that the most favorable view to petitioner on the basis of this record is that she hoped at some later date to engage in a kennel business and was taking steps during 1964 looking toward preparing herself to engage in such a business. *68 Respondent contends that on the basis of this record, petitioner has failed to show that she is entitled to any deduction for business expenses or for losses in connection with her kennel during the year 1964. Petitioner argues that all the facts and circumstances before petitioner in late 1962 or early 1963 point to the conclusion that she did have a bona fide intent to make a profit. From the record in this case, we conclude that petitioner has failed to show any such intent. Petitioner testified that the normal stud fee for a good dog was $150 per service and she had been told that the best possibility of making a profit from a kennel operation was to sell the services of a stud dog which had won dog shows. She specifically denied that she expected or intended to make a profit from breeding and selling puppies. [2] However, petitioner's actions during 1963 and 1964 and for some 1217 time thereafter were not directed toward acquiring a stud dog for sale of his services. During the year in issue, petitioner owned a male German shepherd on which the prior owner had retained the breeding rights, a male poodle which was not suitable for stud services sales, a female poodle which petitioner admitted she was keeping as a pet, and a female German shepherd puppy which was not sufficiently mature to breed in 1964. In order to enter the business of selling the services of a stud dog bred in her own kennel, which petitioner testified she had been told would be the "best possibility" of making a profit from a kennel, petitioner would in years subsequent to that here in issue have to breed her female and select and keep a male which she could train and show until he becomes a champion so as to be valuable for sale of stud services. Under such a method of operation, petitioner's goal of having a stud whose services could be sold *70 would at best require several years even if the male puppy she retained in the hope of breeding a champion turned out to be a champion which might or might not be the case. Petitioner would have acted more directly in line with a plan to make a profit from the sale of the services of a stud dog if she had acquired a male puppy with champion potential in 1964. Petitioner specifically testified that in order to make a profit in 1963 or 1964 she would have had to buy a good stud dog at that time. Petitioner gave no direct explanation of why she did not acquire a male puppy during the year 1964 or take some other action more directly aimed at attaining her claimed goal of developing a champion stud than the acquiring of a very young female puppy. From the record as a whole we conclude that petitioner had formulated no definite plans during the year 1964 for a kennel business which she believed would be a profitable operation. With the knowledge that in order to make a profit in 1963 or 1964 she "would have had to buy a good stud dog" at that time, petitioner in 1964 bought a female dog which had been sired at another kennel by a male which had been given to her so she could furnish a good *71 home for him. Petitioner's actions in 1964 are those of one who is pursuing a hobby and not a business. Petitioner argues that the "size of operation" test or "reasonable expectation of profit" test is without merit, citing Mercer v. Commissioner, 376 F. 2d 708 (C.A. 9, 1967), reversing a Memorandum Opinion of this Court, and Brooks v. Commissioner, 274 F. 2d 96 (C.A. 9, 1959), reversing 30 T.C. 1087. Both of these cases are distinguishable from the instant case on their facts. Those cases dealt in part with the extent to which the size of an operation should be considered in determining whether amounts expended in connection therewith were spent in preparation to enter into a trade or business. From the record in the instant case, petitioner's activities in 1964 are not shown to be even preparatory to any "hoped for" profitable operation except in a most indirect way. The record does not show whether petitioner retained a male puppy from Klasse's litter whelped in late 1965. Petitioner did not state in her testimony that she retained one of these puppies and the inference from her testimony is that she sold all the puppies. The records which are in evidence show that ten puppies were *72 whelped and nine puppies sold but the evidence contains no explanation of what happened to the tenth puppy. Petitioner was "too busy" with her home to breed Klasse in 1966. No explanation is given as to why petitioner did not breed Klasse in 1967 but the record does show that the second time Klasse was bred was in March 1968. There is no indication in the record that the litter from this breeding had been whelped at the date of the trial of this case. The record does not show how petitioner acquired the immature male German shepherd she had at the date of the trial of this case. However, since petitioner testified that the dog was still not sufficiently mature to advertise for stud services in May 1968, it is doubtful that he came from a litter whelped in September 1965. The inference is that petitioner purchased the male puppy and did not retain a male bred in her kennel. Petitioner argues on brief that her testimony and her records are the only evidence from which the Court can determine her intent. Petitioner did not in fact testify that she intended to make a profit from raising and selling the services of a prize stud. 1218 She testified that she came to the conclusion that *73 there was a "profit potential" in a dog kennel and that some persons told her that "the best possibility" of making a profit was to breed, raise, and sell the services of a champion stud but not that she had any intent to make a profit in this manner. She did testify that she wanted to get a good stud dog that she could use for services and that she hoped would eventually become a champion. [3] *74 However, even if petitioner had stated in her testimony that she had an intent to make a profit from her kennel operation, this conclusive statement would not be binding on this Court since it would be inconsistent with the other evidence of record which does consist to an appreciable extent of records kept by petitioner. The intent of a taxpayer is determined by a consideration of all of the evidence. Hirsch v. Commissioner, supra.While the testimony of a taxpayer as to his intent is to be considered, such testimony is not conclusive. When the stated intent appears improbable in the light of other proven circumstances, such testimony is not persuasive as to the true intent of the taxpayer. Army Times Sales Co., 35 T.C. 688 (1961). Respondent argues that petitioner's "profit motive" is belied by a lack of concern for expense reduction. On discovery of Gigi's nonproductivity, *75 petitioner did not "call" the animal. Petitioner should at least have reduced her claimed "business" expenses by the amount attributable to Gigi but this did not occur to petitioner until after respondent questioned the deduction of any expenses. Petitioner was an auditor by profession and certainly must have been capable of allocating expenses. Respondent also points to petitioner's disregard for the cost of obtaining supplies. Petitioner testified that she made separate trips to buy dog food and to buy her own groceries, although dog food was purchased from ordinary food markets. She testified that she shopped around to save a few cents by buying eggs, for example, where they were on sale. The result is that petitioner drove over 80 miles on May 16, 1964, to buy dog food and supplies which cost approximately $17. Nothing unusual was purchased on that day. At the 10-cents-per-mile rate which petitioner claimed for travel expense, her cost of supplies was increased by $8. Although we have not set forth in our findings of fact all of the record of expenses which petitioner kept, this incident is not unusual. We do not consider that petitioner had a businesslike way to purchase supplies *76 and agree with respondent that the lack of a businesslike manner of operation militates against any profit motive in her kennel operation. Petitioner has argued that the fact that she spent such a large portion of her income on her kennel indicates that she was not operating it exclusively for "fun." This argument would be more persuasive if this record contained facts to indicate that petitioner's entire source of support was the income from wages and salary reported on her income tax return. We have no evidence that such is the fact and the indications in the record are to the contrary. Petitioner is a married woman. She filed a separate return and there is no evidence concerning her husband's income or the support furnished by him to her. Furthermore, some of petitioner's expenditures such as mileage and rent were basically nondeductible personal expenses and there is no satisfactory proof that they would have been substantially less, if any, had petitioner not kept dogs. Respondent contends that even if we were to decide that petitioner was engaged in the trade or business of operating a kennel, petitioner's claimed deductions for rent and travel are not supported by the record *77 and should be denied. Our holding that during 1219 the year 1964 petitioner was not engaged in a business or a transaction entered into for profit or for the production of income in operating her dog kennel, move it unnecessary for us to decide this issue. However, we agree with respondent that petitioner has failed to prove that she incurred these expenses in the amounts claimed as a part of the operation of her dog kennel. From the evidence we conclude that petitioner has failed to establish that she is entitled to deduct her claimed expenses or loss in the operation of her dog kennel during the year 1964. Decision will be entered for respondent. Footnotes
1. The registered names of these dogs, respectively, were Bogardus' Monty, Jerane's Gi-Gi Coquette, and Dolthom's Prince Pagliacci.↩
1. Initials following the store name appear to designate towns such as Azusa, El Monte, Arcadia. ↩
2. In this respect petitioner testified: Q. Now, in the year 1963, you had expenses of over $1,000.00? A. Yes. Q. Now, how many puppies would you have had to have to have broken even for that year? Have you any idea? A. You don't break even on the sale of puppies. This is why I was trying to breed for a good stud dog. Q. Then when you went into the year 1964, of course, you knew that you couldn't cover your expenses by the production of puppies; is that correct? A. Well, I knew that in 1963 when I started it. Q. Did you also know that in 1964? A. Yes.
[2]↩ S.T. appears to indicate "state tax."
1. Petitioner had no income from her operations in 1964; therefore, her expenses equal her loss. Petitioner in her brief mentions section 212, I.R.C. 1954, which provides for the deduction by an individual of all ordinary and necessary expenses paid or incurred for the production of income but makes no argument based on this section. Since both parties recognize that an intent to make a profit is a necessary factor for a deduction for expenses of or a loss from an operation to be allowable to an individual under any section of the Code, we will not specifically discuss the applicability of section 212↩ since neither party does so.
3. Petitioner's testimony in this regard is as follows: Q. Would you go back to prior to the time that you actually started or embarked on this project and relate to the Court the manner in which you planned to operate? A. How to start the kennel, you mean? Q. What your over-all objectives were. A. I planned on breeding my toy poodles to begin with in order to take the money from the sale of those puppies to buy a good German shepherd bitch. Q. Well, as one of your primary purposes to breed and sell puppies themselves? A. No, sir. Q. What was your primary purpose? A. To get a good stud dog that I could use for service, one that would win and eventually, I hope, become a champion. Q. Would you then relate to the Court the extent of your activities in this project in the year 1963? A. Yes. I bred my toy poodles and from the sale of those puppies I purchased a German shepherd bitch in 1963, in November, I think it was, or made arrangements to. The pup wasn't old enough, of course. Q. Did you receive any money from the sale of puppies or from stud fees in 1963? A. Not from stud fees, no, only the sale of puppies.↩